HAEGGQUIST & ECK, LLP
ALREEN HAEGGQUIST (221858)
  alreenh@haelaw.com
JENNA M. RANGEL (272735)
  jennar@haelaw.com
ANNA SCHWARTZ (346268)
  annas@haelaw.com
225 Broadway, Suite 2050
San Diego, CA  92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878

Attorneys for Plaintiff Kara Sandler

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARA SANDLER, an Individual, | Case No.:  **'24 CV 0812 AJB  DDL** |
| Plaintiff, | COMPLAINT FOR DAMAGES |
| v. | |
| MODERNIZING MEDICINE, INC., a Delaware Corporation, | |
| Defendants. | <u>DEMAND FOR JURY TRIAL</u> |

HAEGGQUIST & ECK, LLP

Plaintiff Kara Sandler ("Ms. Sandler" or "Plaintiff"), by her attorneys, brings this action on behalf of herself against Defendant Modernizing Medicine, Inc. ("Modernizing Medicine," "ModMed," or "Defendant"). Ms. Sandler makes the following allegations upon information and belief (except those allegations as to Ms. Sandler or her attorneys which are based on personal knowledge), based upon an investigation that is reasonable under the circumstances, which allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and/or discovery.

## NATURE OF THE ACTION

1.      Ms. Sandler is an accomplished professional who spent the last twenty years building her career as a medical software salesperson. Though Ms. Sandler is also a person with mental disabilities – anxiety, depression, and Post Traumatic Stress Disorder ("PTSD") – her mental disabilities have never stopped her from achieving professional success. Indeed, for the last decade, Ms. Sandler excelled as a Regional Sales Manager at ModMed, a medical software company that develops electronic health records systems for eleven different medical specialties. In 2022, after eight years as a top-performer, Ms. Sandler was recruited to transfer from ModMed's Gastroenterologist division to its Urology division under a new supervisor, Marissa Marks, who was approximately thirty years younger than Ms. Sandler. Almost immediately, Ms. Marks began treating Ms. Sandler differently than her younger colleagues – micromanaging Ms. Sandler, incessantly hounding her about alleged (and inaccurate) deficiencies in her work, and making inappropriate comments about her age, mental disabilities, and need for time off to care for her ailing mother.

2.      After months of dealing with Ms. Marks' discriminatory treatment, which triggered and exacerbated Ms. Sandler's mental disabilities, she was forced to request medical leave. While on leave, and with the advice of her health care provider, Ms. Sandler requested to transfer to a different division, away from Ms. Marks, as an accommodation for her mental disabilities. But, instead of considering this reasonable

HAEGGQUIST & ECK, LLP

accommodation or even exploring alternative accommodations, ModMed saw an "easy out" to get rid an older, disabled employee, refused to return Ms. Sandler from leave, and wrongfully terminated her employment instead.

3.     To redress the harms suffered, Ms. Sandler brings claims for: (1) age discrimination in violation of California Government Code ("Government Code") §12940(a); (2) disability discrimination in violation of Government Code §12940(a); (3) failure to provide reasonable accommodations in violation of Government Code §12940(m); (4) failure to engage in the interactive process in violation of Government Code §12940(n); (5) California Family Rights Act ("CFRA") retaliation in violation of Government Code §12945.2(k); (6) Family and Medical Leave Act ("FMLA") interference in violation of 29 U.S.C. §2615(a); (7) retaliation for requesting reasonable accommodations in violation of Government Code §12940(m)(2); and (8) failure to prevent discrimination and retaliation in violation of Government Code §12940(k).

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action under: 28 U.S.C. §1332(a)(1) because Plaintiff is a citizen of California, Defendant is a citizen of Delaware and has its principal place of business in Florida, and the amount alleged to be in controversy exceeds $75,000, excluding interest and costs; and (2) 28 U.S.C. §1331 because Plaintiff asserts a cause of action for FMLA Interference under 29 U.S.C. §2601, *et seq*.

5.     The Southern District of California has personal jurisdiction over the parties in this matter. Plaintiff is, and at all relevant times was, a citizen of San Diego, California. Although Defendant is a Delaware corporation, with its principal place of business located in Florida, it has sufficient minimum contacts in California and otherwise purposefully availed itself of the benefits of doing business in the State of California so as to render the exercise of jurisdiction by this Court consistent with notions of fair play and substantial justice. Defendant is registered with the California

HAEGGQUIST & ECK, LLP

3

Secretary of State as a corporation that does business within California, operates in California, markets and sells its products and services in California, and has numerous employees in California, including in San Diego, California, where Ms. Sandler was employed.

6.      Venue is proper in the Southern District of California under 28 U.S.C. §1391 because Plaintiff and Defendant are, and at all relevant times have been, subject to the personal jurisdiction of this Court, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Further, venue is proper under Government Code §12965(a)(4) because the unlawful practices, at least in part, were committed within this District.

### THE PARTIES

#### Plaintiff Kara Sandler

7.      Ms. Sandler is a natural person, over 18 years old, residing in the State of California. Ms. Sandler was an employee of Defendant from October 1, 2015, until her termination on August 21, 2023, during which time Ms. Sandler was a resident of and performing services for Defendant in the County of San Diego, State of California. Ms. Sandler is informed and believes, and thereon alleges, that she was an eligible employee within the meaning of the FMLA and the CFRA because she was employed by Modernizing Medicine for at least 1,250 hours of service during the 12-month period just prior to taking medical leave and at a worksite where Modernizing Medicine employed at least 50 employees within 75 miles. Ms. Sandler is, and at all relevant times was, a member of a protected class within the meaning of the California Fair Employment and Housing Act, Government Code §12940, *et seq.* ("FEHA"), because of her age (59 years old during the relevant time period) and mental disabilities, and within the meanings of the FMLA and CFRA because of her serious health conditions.

HAEGGQUIST & ECK, LLP

COMPLAINT FOR DAMAGES

**Defendants**

8.     Modernizing Medicine is a Delaware corporation, registered with the California Secretary of State to do business in California, and with its principal place of business located at 4700 Exchange Court, Suite 225, Boca Raton, Florida 33431. Ms. Sandler is informed and believes, and thereon alleges, that at all relevant times mentioned herein, Modernizing Medicine engaged in commerce and employed 50 or more employees for each working day of the 20 workweeks just prior to Ms. Sandler taking medical leave under the FMLA and CFRA. Therefore, Modernizing Medicine is, and at all relevant times mentioned herein was, an "employer" under Government Code §§12926(d) and 12945.2(b)(4)(A), and 29 U.S.C. §2611(4)(A).

9.     In doing the acts alleged herein, Defendant's employees, subcontractors, and agents acted within the course and scope of their employment and agency with Defendant. Defendant engaged in the acts alleged herein and/or condoned, permitted, authorized, and/or ratified the conduct of its employees, subcontractors, and agents, and is vicariously liable for the wrongful conduct of its employees, subcontractors, and agents alleged herein.

10.     Plaintiff is informed and believes, and thereon alleges, that each Defendant is, and at all times mentioned was, the agent, employee, or representative of each other Defendant. Each Defendant, in doing the acts, or in omitting to act as alleged in this Complaint, was acting within the scope of his or her actual or apparent authority, or the alleged acts and omissions of each Defendant as agent were subsequently ratified and adopted by each other Defendant as principal.

**EXHAUSTION OF REMEDIES**

11.     On March 22, 2024, Ms. Sandler filed a charge of discrimination with the California Civil Rights Department ("CRD") against Modernizing Medicine. That same day, the CRD closed Ms. Sandler's case and issued a Right-to-Sue letter. *See* **Exhibit 1** attached hereto. Therefore, Ms. Sandler has exhausted her administrative remedies.

## FACTS COMMON TO ALL CAUSES OF ACTION

**Ms. Sandler Is an Accomplished Salesperson and Was a Top Performer for ModMed for Nearly a Decade**

12.    Over the last twenty years, Ms. Sandler has had a very successful career selling electronic health records ("EHR") software, which provides electronic charting capabilities for medical professionals to track patient care at doctors' offices and hospitals. Ms. Sandler began selling EHR software in 2004 and did so successfully at several different companies, and for several different medical specialties including Gastroenterology ("GI") and Urology before being recruited to join gMed, Inc. ("gMed") in late 2013.

13.    gMed provided EHR, billing, and revenue cycle management solutions for medical specialties and created a software entitled "gGastro," which was specifically designed for GI practices. From 2013 to 2015, Ms. Sandler was a sales representative for gMed's West Coast territory, significantly exceeding her sales quota and earning awards such as the Top Performer Award and the President's Club Award for being gMed's number one sales representative.

14.    In September 2015, ModMed acquired gMed and its gGastro software. ModMed develops and sells EHR software for eleven different specialties, including GI and Urology. Each specialty had a General Manager that oversaw the entire specialty division, a National Sales Director that supervised the sales team, Regional Sales Managers assigned to various territories across the United States, and Sales Engineers that demonstrated the software during sales presentations and at trade shows. As such, on October 1, 2015, Ms. Sandler became a Regional Sales Manager for ModMed's new GI Team, continuing to sell the gGastro software throughout her West Coast territory. As a Regional Sales Manager, Ms. Sander handled all parts of the sales process including finding sales leads, following up with potential buyers, making sales presentations, negotiating contracts, and closing deals. Ms. Sandler

HAEGGQUIST & ECK, LLP

spent more than 50% of her time travelling, giving sales presentations, and attending conferences throughout the United States.

15.    Although the travel and workload were demanding, Ms. Sandler excelled in sales for ModMed just as she did for gMed. Ms. Sandler led the GI Team in sales in 2015, 2017, 2019, 2020, 2021, and 2022, regularly exceeding her sales quotas and earning every sales award available, including the Trailblazer Award, multiple President's Club Awards, the Teamwork Achievement Award, and multiple Top Performer Awards. Ms. Sandler was recommended for management training as one of ModMed's "Emerging Leaders" and won numerous contests and bonuses for her sales skills. Due to Ms. Sandler's exceptional performance, she was promoted from Regional Sales Manager to Senior Regional Sales Manager in late 2020.

**Ms. Sandler's Mental Disabilities Never Hindered Her Performance and She Was Sought After to Grow Other ModMed Specialty Divisions, Including Urology**

16.    Separate from her career success, Ms. Sandler is a person with mental disabilities –anxiety, a major depressive disorder, and PTSD – for which she has received regular and continuing treatment. Although she experienced bouts of anxiety, depression, and triggered PTSD, including panic attacks, throughout her life, Ms. Sandler's mental disabilities have never hindered her professional success. In fact, during her eight years on ModMed's GI Team, Ms. Sandler never requested any disability-related medical leaves or accommodations. She had a flexible schedule working West Coast hours and never had any issues when she needed time off for things like medical appointments or to care for her elderly mother who had health issues.

17.    Further, Ms. Sandler had no interpersonal conflicts with her colleagues or the various supervisors she reported to, no performance issues or negative performance reviews, and no disciplinary actions. Instead, Ms. Sandler was considered the "quarterback" of the GI Sales Team and although she had tried and

HAEGGQUIST & ECK, LLP

true sales techniques, she was always open to new techniques and worked collaboratively with her National Sales Director to determine which strategies worked best. Further, Ms. Sandler was given total autonomy to manage her deals from start to finish.

18.    Beginning in approximately 2020 and 2021, ModMed's Urology and Orthopedics divisions began recruiting Ms. Sandler to leave GI for their sales teams as transferring to different specialties was common amongst ModMed's employees. Indeed, ModMed prided itself on cross training its salespersons in multiple specialties. Urology was a newer specialty, had a much smaller market share than GI and Orthopedics, and needed a seasoned salesperson with experience in closing major deals, like Ms. Sandler. To entice Ms. Sandler to transfer to Urology, Chief Revenue Officer Brian Boyd told her that Urology had "large-scale accounts." Vice President of Sales Rick Trefzger and General Manager of Urology Marissa Marks told Ms. Sandler the Urology Sales Team was fully staffed, well-supported, and had a "four-million-dollar pipeline" of accounts. They also described the Urology software as "fantastic" and in "high demand" with a "beautiful timeline."

19.    By late 2021, after nearly two years of being recruited by Urology and/or Orthopedics, Ms. Sandler finally agreed to transfer to Urology. Although Ms. Sandler was happy and extremely successful on the GI Team, a transfer to Urology appeared to be a savvy career decision based on the promises of Mr. Boyd, Mr. Trefzger, and Ms. Marks. Additionally, Ms. Sandler wanted to be a "team player" for the success of the company. As such, Ms. Sandler accepted the offer and started with Urology on January 1, 2022; however, she was given a three-month transition period within which she was to wrap up her pending GI deals while still being held to the same annual sales quota as the rest of the Urology Team.

20.    Unfortunately, after the transition period ended, Ms. Sandler soon discovered that Urology's sales pipeline, staffing, and support-level were a far cry from what had been promised. Urology's pipeline was significantly smaller and held

COMPLAINT FOR DAMAGES

HAEGGQUIST & ECK, LLP

only mid-level accounts and the Sales Team was severely understaffed, with three Regional Sales Managers leaving ModMed shortly after Ms. Sandler fully transitioned to the Team. Further, the Urology software was not up to market standards and ModMed did not provide Ms. Sandler with adequate training or support on the software. But, as Ms. Sandler was always willing to do what it took to help the company succeed, she put in the effort to learn the software and began to strategize on how to best to attack the market.

**After Transferring to Urology, Ms. Sandler's Mental Disabilities Were Triggered by Her New Supervisor's Discriminatory and Inappropriate Conduct**

21.    In or about August 2022, General Manager Ms. Marks took over as the National Sales Director of Urology after the former National Sales Director suddenly left. By this time, the Urology Sales Team consisted only of Ms. Sandler (who was 59 years old at the time), Brittany Pierce (who, on information and belief, was under 40 and had just started with ModMed in late 2021), and Ms. Marks (who, on information and belief, was under 40). Ms. Marks had no prior experience in sales or managing a sales team. Though Ms. Sandler tried to establish with Ms. Marks the same collaborative relationship she had with her prior National Sales Directors, it soon became clear that Ms. Marks did not want to work with a seasoned employee like Ms. Sandler and her "old ways." Instead, Ms. Marks treated Ms. Sandler differently and more harshly that her younger colleague, Ms. Pierce, who was much closer in age to Ms. Marks than Ms. Sandler.

22.    To start, Ms. Marks condescendingly told Ms. Sandler it was "different" in Urology and that her "old ways won't work here." Unlike Ms. Sandler's prior National Sales Directors, Ms. Marks insisted on micromanaging Ms. Sandler and being involved in every aspect of her sales, dictating who she should call and how frequently, the information she needed to obtain from potential customers before sales presentations, and sitting in on Ms. Sandler's sales presentations, undermining Ms.

Sandler's knowledge and experience in front of potential customers. When Ms. Marks' strategies did not work, and Ms. Sandler questioned them or attempted to rely on her own tried and true sales techniques, Ms. Marks said words to the effect of, "I'm your manager, you have to do what I say." On information and belief, Ms. Marks did not micromanage Ms. Pierce like she did Ms. Sandler.

23.    Ms. Marks also required Ms. Sandler to be online and available at all times Ms. Marks needed her and based on Ms. Marks' schedule, including weekends and East Coast time as Ms. Marks was primarily based in Florida. But oftentimes when Ms. Sandler needed Ms. Marks, she was unavailable because she was on vacation, getting her hair done, or out of office for some other reason without notating her unavailability on the calendar. Further, when Ms. Sandler needed time off for doctor or dentist appointments, or to care for her mother who had recently been diagnosed with Alzheimer's, Ms. Marks berated Ms. Sandler for being unavailable. On information and belief, Ms. Marks did not have the same scheduling expectations of Ms. Pierce or berate her for being unavailable.

24.    Furthermore, Ms. Marks demanded unrealistic sales results from Ms. Sandler (who had only completed her Urology training in July 2022) and constantly changed her mind on sales strategies, often at the last minute, which made meeting Ms. Marks' expectations impossible. Ms. Marks also left Ms. Sandler off emails and scheduled meetings without her knowledge or participation, keeping Ms. Sandler in the dark on many of her deals. Then, when Ms. Marks' chaotic management style caused problems with sales presentations, she belittled and demeaned Ms. Sandler, unfairly criticized her performance, and threw Ms. Sandler under the bus instead of taking accountability for her own mistakes. On information and belief, Ms. Marks did not unfairly blame, criticize, belittle, and demean Ms. Pierce.

25.    Additionally, Ms. Marks made inappropriate comments about Ms. Sandler's age, asking on several occasions if Ms. Sandler was going out for the "early bird special" and complaining she was "hard to read" and "played things too close to

COMPLAINT FOR DAMAGES

HAEGGQUIST & ECK, LLP

her chest" like her 50-year-old ex-boyfriend (who was in management at ModMed), who Ms. Marks referred to as "so old." On information and belief, Ms. Marks did not make comments about Ms. Pierce's age or compare Ms. Pierce to her 50-year-old ex-boyfriend.

26.    Ms. Marks' chaotic management style, the lack of training and support, and the lower market demand naturally affected Ms. Sandler's sales and she (like Ms. Pierce) did not meet her 2022 sales quota; however, despite these challenges, Ms. Sandler still ended 2022 with the highest sales in Urology and closed Urology's largest deal of the year. Before the end of the year, Ms. Sandler met with Vice President of Sales Mr. Trefzger about the lackluster state of the Urology market. Concerned, Ms. Sandler asked if she would be moved to another specialty if Urology folded. Mr. Trefzger told Ms. Sandler, "Of course," as there were always open positions on the other teams.

27.    Unfortunately, Ms. Sandler's anxiety, depression, and PTSD were being triggered due to Ms. Marks' unfair treatment, which Ms. Sandler felt were discriminatory and causing a hostile work environment. Ms. Sandler informed Ms. Marks of her mental disabilities, the medications she took and the regular treatment she received for her mental disabilities, and of her mother's Alzheimer's diagnosis as her mother was requiring more and more care.

28.    Following these conversations, Ms. Marks began bullying Ms. Sandler even more. Over the first three months of 2023, Ms. Marks bombarded Ms. Sandler with impossible demands and blamed her for any issues that arose during the sales process, even issues out of Ms. Sandler's control. Despite Ms. Sandler's requests, Ms. Marks continued to exclude her from meetings and important emails and disparaged her performance to other team members. Ms. Marks told Ms. Sandler that she was "too sensitive" which made her difficult to manage and that her "tactics didn't work on [Ms. Sandler]." Several times, Ms. Marks made threatening comments that she

COMPLAINT FOR DAMAGES

HAEGGQUIST & ECK, LLP

could "get anyone fired" simply because she "didn't like them" and implied that she would never be fired because she "knows where the bodies are buried."

29.    Further, despite ending 2022 with the highest sales on the Urology Team, Ms. Sandler received the lowest performance review she had ever received while at ModMed. In her 2022 Annual Sales Performance Appraisal, given by Ms. Marks in February 2023, Ms. Marks rated Ms. Sandler as "needing improvement" in technical/professional knowledge, work management/productivity, and communication effectiveness, which dragged Ms. Sandler's overall score down to 2.6/5.0 despite receiving "fully meets," "exceeds," or "significantly exceeds expectations" in the remaining seven performance categories. Ms. Marks recognized in the Appraisal that Ms. Sandler had "proven her success both inside and outside of ModMed year over year," that the challenges she faced in 2022 were "incurred along with the rest of the team," and that Urology had faced "an incredibly challenging market, a lack of demand gen, a smaller than anticipated TAM and lacking training/management support early on." Despite this, Ms. Marks threatened that Ms. Sandler would be placed on a Performance Improvement Plan if she did not improve. On information and belief, Ms. Marks did not threaten Ms. Pierce with a Performance Improvement Plan despite achieving lower sales than Ms. Sandler.

30.    At the same time, Ms. Marks began laying out a written record to set Ms. Sandler up for termination. In late February 2023, Ms. Marks sent Ms. Sandler several emails reprimanding her for alleged "performance concerns." Ms. Marks nitpicked Ms. Sandler for allegedly failing to update notes in the team's sales tracking software, making spelling and grammatical errors in emails, and failing to knowledgably answer customer questions during a sales presentation. Although these criticisms were completely unwarranted, Ms. Sandler ensured all alleged issues were taken care of and again requested that Ms. Marks "please keep the lines of communication open so I don't continue to duplicate efforts and waste valuable time." Ms. Sandler reminded Ms. Marks that "keeping me in the dark puts me in a very bad position and

only sets me up for failure instead of success." Ms. Sandler felt Ms. Marks was unfairly setting her up for failure, which was triggering her anxiety, depression, and PTSD as a result.

31.    Further, Ms. Marks also bullied Ms. Sandler for her mother's Alzheimer's struggle. Every time Ms. Sandler took time to care for her mother, Ms. Marks would guilt her for being "distracted." Upon each return to work, Ms. Marks would interrogate Ms. Sandler by questioning, "Is your head back? Are you back emotionally?" And after Ms. Sandler had to leave a sales trade show one day early (on a Sunday) because her mother was in the emergency room, Ms. Marks then pulled Ms. Sandler off a sales presentation, stating something to the effect of, "I cannot trust you [to participate in the presentation] because of your mom stuff." Ms. Marks also continued to claim Ms. Sandler was lacking in "follow up," "attention to detail," and "urgency," all while repeatedly bring up Ms. Sandler's mother.

**Ms. Sandler Required Medical Leave Due to Ms. Marks' Discriminatory Treatment**

32.    By April 2023, due to Ms. Marks' discriminatory treatment, Ms. Sandler's symptoms of anxiety, depression, and PTSD were exacerbated, she felt "distressed" and "hopeless" about her work environment and relationship with Ms. Marks and was "frozen" and "scared" due to her overwhelming anxiety. Ms. Marks was well-aware of Ms. Sandler's escalating mental health issues. But, instead of providing support or engaging in the interactive process to identify potential accommodations, Ms. Marks warned Ms. Sandler she better "take mental health disability leave soon" because her performance was "just not up to par." Ms. Mark's threats to Ms. Sandler's job security further exacerbated her anxiety, depression, and PTSD.

33.    In the meantime, Ms. Marks was also already setting up Ms. Sandler's replacement. In or about early 2023, Ms. Marks hired Regional Sales Manager David Weld (who, on information and belief, was under 40 years old) to allegedly cover the

HAEGGQUIST & ECK, LLP

Midwest territory beginning on May 1, 2023. But Mr. Weld lived in California, which was highly uncommon and suspicious for someone covering the Midwest territory. Ms. Marks was also soliciting negative information about Ms. Sandler from other ModMed employees and sending negative comments to Human Resources Representative Lindsay Wehmeyer and Vice President of Sales Mr. Trefzger about Ms. Sandler's performance including that she was allegedly not responding to communications "within a reasonable time period," was not "contributing" during meetings, and was lacking in "follow up" and "attention to detail."

34.    By May 2023, Ms. Sandler's anxiety, depression, and PTSD were so severe that her psychologist recommended she take mental health leave. Ms. Sandler's mother's health was also rapidly declining. As such, on May 3, 2023, Ms. Sandler emailed ModMed's Benefits Team and requested FMLA/CFRA leave to care for her mother. On May 8, 2023, Ms. Sandler's psychologist also provided a note that Ms. Sandler was "under [her] care" and needed "medical leave as of … May 5, 2023." Ms. Sandler submitted this note to Ms. Marks, Ashley Collier in Benefits, and ModMed's Human Resources, and to The Hartford, which administered ModMed's medical leaves and disability benefits. On May 25, 2023, The Hartford/ModMed approved Ms. Sandler's requests for leave under the FMLA/CFRA through June 25, 2023, which was thereafter extended to August 14, 2023 based on Ms. Sandler's psychologist's recommendations.

**ModMed Unlawfully Denied Ms. Sandler's Request for Reasonable Accommodation to Return to Work and Wrongfully Terminated Ms. Sandler Instead**

35.    In the meantime, on or about June 15, 2023, Ms. Sandler submitted a disability accommodation request to The Hartford, which was subject to ModMed's approval. Based on her psychologist's recommendation, Ms. Sandler requested to be transferred to a new supervisor because "Ms. Sandler's traumatic responses were triggered by the combination of her interactions  with her current supervisor and the

HAEGGQUIST & ECK, LLP

health issues with her mother" and "if Ms. Sandler does not have to cope with the overwhelming anxiety and dissociation triggered by her supervisor's behavior, [her] symptoms are likely to be manageable while performing her job responsibilities." But ModMed did not immediately respond to Ms. Sandler's accommodation requests or attempt to engage in the interactive process to determine whether it could provide her requested accommodation or a different accommodation.

36.    In the meantime, Ms. Marks had Mr. Weld working on Ms. Sandler's West Coast accounts and continued to send negative comments about Ms. Sandler's performance, including blaming Ms. Sandler for failed deals, to Ms. Wehmeyer and Mr. Trefzger. Ms. Marks even completed another negative mid-year performance review for Ms. Sandler in on July 18, 2023, after Ms. Sandler had been out on medical leave for several months.

37.    After ModMed had not responded to Ms. Sandler's accommodation requests by August 2023, she reached out and spoke with Human Resources Representative Ashley Collier to discuss extending her leave to November 6, 2023 (for which Ms. Sandler submitted another note from her psychologist) and her accommodation request. Over the phone, Ms. Collier approved Ms. Sandler's extended return date of November 6, 2023, and informed Ms. Sandler that ModMed would consider her accommodation request. Based on this phone call, Ms. Sandler felt confident ModMed was investigating potential accommodations, and that she would be back to work in no time.

38.    Then, on the morning of August 17, 2023, Ms. Collier called Ms. Sandler with an ultimatum—either return to work tomorrow or be terminated. In a follow up email, Ms. Collier claimed Ms. Sandler's FMLA/CFRA had been extended only to August 14, 2023, and if she failed to return the next day, on August 18, 2023, "***ModMed will, unfortunately, have to consider your employment terminated***."

39.    Ms. Sandler was stunned and panicked. Within hours, she sent an email to Ms. Collier, copying Chief Revenue Officer Mr. Boyd, reminding them that "we

put the ADA in place. My disability continues and is tied to my manager. The accommodation is to move me to another team. As you know, I have been very successful at ModMed, prior to joining [Ms. Marks'] team." Ms. Sandler got no response.

40.    After Ms. Sandler was unable to reach Ms. Collier by phone, she sent another email to Ms. Collier, copying Ms. Marks and Mr. Boyd, begging them to reconsider. In her email, Ms. Sandler explained she was completely blindsided by the ultimatum, especially given the fact Ms. Collier had extended Ms. Sandler's leave to November 6, 2023 the week prior. Ms. Sandler noted, "I am aware that sufficient staffing is in place, therefore I am confused why you told me there is a hardship on my team because of my absence." Ms. Sandler also confirmed, "I have no intention of leaving ModMed. As you know, I have two doctors that state I need an additional three months which are covered under the ADA. Please let me know if you still insist I return to work tomorrow at 7 am PST. I want to make sure I am not terminated tomorrow." In response, Ms. Collier gave Ms. Sandler one additional day of leave so she could "review your information with our team."

41.    Thereafter, on August 21, 2023, Human Resources Lindsay Wehmeyer terminated Ms. Sandler via email. Ms. Wehmeyer blamed Ms. Sandler for the termination claiming Ms. Sandler had squandered any opportunity to return to ModMed when her psychologist requested "a permanent accommodation that [Ms. Sandler] no longer work with Marissa [Marks]." Scapegoating Ms. Sandler's psychologist's recommendation, Ms. Wehmeyer stated, "***You are not qualified to perform the role of Regional Sales Manager, with or without an accommodation, in part, because it reports to Marissa [Marks] and will continue to report to Marissa [Marks] in the foreseeable future. Thus, your employment at ModMed is terminated effective August 21, 2023***."

42.    Frantic, Ms. Sandler emailed Ms. Wehmeyer explaining her psychologist had proposed the department transfer as one option for accommodation because it was

HAEGGQUIST & ECK, LLP

"*the quickest way of getting [Ms. Sandler] back to work*." Ms. Sandler also reiterated that Ms. Marks had been harassing her for months, and she did not understand why ModMed so steadfastly refused to investigate Ms. Marks' harassment and/or transfer her to another sales team (as there were many open positions in ModMed's ten other specialities). In the email, Ms. Sandler questioned, "*Why didn't anyone ever call me to discuss our options? I don't understand after 10 years of loyal service that no one would call me to discuss how I could return instead of losing my career*."

43.    Despite Ms. Sandler's pleas, ModMed refused to reconsider the termination. Over the following days, Ms. Sandler was forced to face the reality that the company she had given ten years of stellar performance to would not support her through her mental disability flare-up. She would not be retiring with ModMed. Rather, ModMed had cast her out of the company at the first sign of vulnerability. As a direct result of the Defendants' conduct, Ms. Sandler has suffered, and continues to suffer, lost wages and benefits, humiliation, embarrassment, emotional distress, and mental anguish.

## COUNT I

### Age Discrimination
### in Violation of California Government Code §12940(a)

44.    Plaintiff realleges and incorporates here by reference each and every allegation in the preceding and subsequent paragraphs.

45.    Under the FEHA, "[i]t is an unlawful employment practice . . . [f]or an employer, because of the . . . age . . . of any person . . . to discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." Cal. Gov't Code §12940(a).

46.    At all relevant times mentioned herein, Defendant was an employer, and Plaintiff was Defendant's employee.

47.    At all times mentioned herein, Plaintiff was in a class of persons protected by Government Code §12940 because of her age as Plaintiff was over forty

HAEGGQUIST & ECK, LLP

2a17150955832c26

years old. Defendant was aware of Plaintiff's age and/or perceived Plaintiff as being over forty years old.

48. As alleged herein, and in violation of Government Code §12940(a), Defendant discriminated against Plaintiff based on her age by subjecting Plaintiff to numerous adverse employment actions, including but not limited to, unwarranted negative performance feedback and reviews, micromanaging, unreasonable performance demands, unwarranted assignment of blame, exclusion from communications, meetings, and presentations, reprimands and threatened disciplinary actions, and termination. Plaintiff's age was a substantial motivating reason for each of Defendant's decisions to take the adverse employment actions against her.

49. As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial losses in earnings, earning capacity, and other benefits of employment, all in an amount to be determined according to proof at the time of trial. Plaintiff will also suffer tax consequences due to Defendant's failure to pay Plaintiff money owed, which will come due in a lump sum in the future. Accordingly, Plaintiff is entitled to an additional amount of damages to offset the tax consequences of a lump sum award for lost earnings, plus interest.

50. As a further proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, humiliation, embarrassment, emotional distress, and mental anguish, all in an amount to be determined according to proof at the time of trial.

51. In performing the acts alleged, which were committed, authorized, and/or adopted and approved by Defendant's officers, directors, or managing agents, Defendant acted with oppression, fraud, malice, and with conscious disregard for the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

52. Plaintiff is also entitled to attorneys' fees and costs pursuant to Government Code §12965(c)(6), because of Defendant's wrongful conduct.

**COUNT II**

**Disability Discrimination**
**in Violation of California Government Code §12940(a)**

53.    Plaintiff realleges and incorporates here by reference each and every allegation in the preceding and subsequent paragraphs.

54.    Under the FEHA, "[i]t is an unlawful employment practice . . . [f]or an employer, because of the . . . mental disability . . . of any person . . . to discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." Cal. Gov't Code §12940(a).

55.    "Mental disability" means "any mental or psychological disorder or condition, such as . . . emotional or mental illness . . . that limits a major life activity." Cal. Gov't Code §12926(j)(1) (2023). "Mental disability" also includes "[b]eing regarded or treated by the employer . . . as having, or having had, any mental condition that makes achievement of a major life activity difficult." Cal. Gov't Code §12926(j)(4). "'Major life activities' shall be broadly construed and shall include physical, mental, and social activities and working." Cal. Gov't Code §12926(j)(1)(C). As such, "'[m]ental disability' includes . . . chronic or episodic conditions such as clinical depression, bipolar disorder, [and] post-traumatic stress disorder . . . ." 2 Cal. Code Regs. §11065(d)(1).

56.    At all relevant times mentioned herein, Defendant was an employer and Plaintiff was Defendant's employee.

57.    At all relevant times mentioned herein, Plaintiff was in a class of persons protected by Government Code §12940 because of her mental disabilities – anxiety, depression, and PTSD. Defendant was aware of Plaintiff's mental disabilities and/or regarded or treated Plaintiff as having a mental disability that made working difficult for Plaintiff.

58.    Despite her mental disabilities, Plaintiff was able to perform her essential job duties, at times with and at times without reasonable accommodations, including

but not limited to a brief medical leave of absence and a department/supervisor transfer.

59.    As alleged herein, and in violation of Government Code §12940(a), Defendant discriminated against Plaintiff because of her mental disabilities and/or perceived mental disabilities when it subjected Plaintiff to numerous adverse employment actions, including but not limited to, unwarranted negative performance feedback and reviews, micromanaging, unreasonable performance demands, unwarranted assignment of blame, exclusion from communications, meetings, and presentations, reprimands and threatened disciplinary actions, refusal to provide disability accommodations, and termination while Plaintiff was on medical/disability leave. Plaintiff's mental disabilities were a substantial motivating reason for each of Defendant's decisions to take adverse employment actions against her.

60.    As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial losses in earnings, earning capacity, and other benefits of employment, all in an amount to be determined according to proof at the time of trial. Plaintiff will also suffer tax consequences due to Defendant's failure to pay Plaintiff money owed, which will come due in a lump sum in the future. Accordingly, Plaintiff is entitled to an additional amount of damages to offset the tax consequences of a lump sum award for lost earnings, plus interest.

61.    As a further proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, humiliation, embarrassment, emotional distress, and mental anguish, all in an amount to be determined according to proof at the time of trial.

62.    In performing the acts alleged, which were committed, authorized, and/or adopted and approved by Defendant's officers, directors, or managing agents, Defendant acted with oppression, fraud, malice, and with conscious disregard for the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

COMPLAINT FOR DAMAGES

63.    Plaintiff is also entitled to attorneys' fees and costs pursuant to Government Code §12965(c)(6), because of Defendant's wrongful conduct.

### COUNT III

**Failure to Provide Reasonable Accommodation**
**in Violation of Government Code §12940(m)**

64.    Plaintiff realleges and incorporates herein by reference each allegation in the preceding and subsequent paragraphs.

65.    Government Code §12940(m)(1) makes it unlawful "[f]or an employer . . . to fail to make reasonable accommodation for the known . . . mental disability of an applicant or employee." Cal. Gov't Code §12940(m)(1). "Mental disability" means "any mental or psychological disorder or condition, such as . . . emotional or mental illness . . . that limits a major life activity." Cal. Gov't Code §12926(j)(1). "Mental disability" also includes "[b]eing regarded or treated by the employer . . . as having, or having had, any mental condition that makes achievement of a major life activity difficult." Cal. Gov't Code §12926(j)(4). "'Major life activities' shall be broadly construed and shall include physical, mental, and social activities and working." Cal. Gov't Code §12926(j)(1)(C). As such, "'[m]ental disability' includes . . . chronic or episodic conditions such as clinical depression, bipolar disorder, [and] post-traumatic stress disorder . . . ." 2 Cal. Code Regs. §11065(d)(1).

66.    "'[T]he term "reasonable accommodation" is to be interpreted flexibly.'" *Prilliman v. United Air Lines, Inc.*, 53 Cal. App. 4th 935, 948 (1997) (citation omitted). The law provides a "non-exhaustive" list of accommodations, including job restructuring, transfer, reassignment to a vacant position, and extended leaves of absence, among many others. *Id.* at 948; Cal. Gov't Code §12926(p); 2 Cal. Code Regs. §§11065(p)(2), 11068(c). Transferring an employee to work under a new supervisor can be a reasonable accommodation. *See, e.g., Do v. Raytheon Co.*, No. B293950, 2020 Cal. App. Unpub. LEXIS 7117, at *7-10 (Oct. 27, 2020).

HAEGGQUIST & ECK, LLP

67.    At all relevant times mentioned herein, Defendant was an employer and Plaintiff was Defendant's employee.

68.    At all relevant times mentioned herein, Plaintiff was in a class of persons protected by Government Code §12940 because of her mental disabilities – anxiety, depression, and PTSD. Defendant was aware of Plaintiff's mental disabilities and/or regarded or treated Plaintiff as having a mental disability that made working difficult for Plaintiff.

69.    Despite her mental disabilities, Plaintiff was able to perform her essential job duties, at times with and at times without reasonable accommodations.

70.    As alleged herein, Plaintiff required and requested reasonable accommodations including medical leave and a department/supervisor transfer. A department/supervisor transfer would have enabled Plaintiff to return to work; however, Defendant discriminatorily refused to approve Plaintiff's accommodation request and refused to provide Plaintiff with any other reasonable accommodation for her mental disabilities, which it could have done without undue hardship. Instead, Defendant wrongfully terminated Plaintiff's employment in violation of Government Code §12940(m).

71.    As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial losses in earnings, earning capacity, and other benefits of employment, all in an amount to be determined according to proof at the time of trial. Plaintiff will also suffer tax consequences due to Defendant's failure to pay Plaintiff money owed, which will come due in a lump sum in the future. Accordingly, Plaintiff is entitled to an additional amount of damages to offset the tax consequences of a lump sum award for lost earnings, plus interest.

72.    As a further proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, humiliation, embarrassment, emotional distress, and mental anguish, all in an amount to be determined according to proof at the time of trial.

22

COMPLAINT FOR DAMAGES

73.    In performing the acts alleged, which were committed, authorized, and/or adopted and approved by Defendant's officers, directors, or managing agents, Defendant acted with oppression, fraud, malice, and with conscious disregard for the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

74.    Plaintiff is also entitled to attorneys' fees and costs pursuant to Government Code §12965(c)(6), because of Defendant's wrongful conduct.

## COUNT IV

### Failure to Engage in the Interactive Process
### in Violation of Government Code §12940(n)

75.    Plaintiff realleges and incorporates here by reference each and every allegation in the preceding and subsequent paragraphs.

76.    Government Code §12940(n) makes it unlawful "[f]or an employer . . . to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known. . . mental disability or known medical condition." Cal. Gov't Code §12940(n). A qualifying mental disability under Government Code §12926 includes any mental illness that limits the person's ability to work. Cal. Gov't Code §12926(j)(1)(C). Employers must engage in an informal, interactive process to determine any accommodations for those individuals "regarded as" disabled. *Gelfo v. Lockheed Martin Corp.*, 140 Cal. App. 4th 34, 61-62 (2006). The affirmative duty to engage in the interactive process is "'continuing'" and is "'not exhausted by one effort.'" *Swanson v. Morongo Unified Sch. Dist.*, 232 Cal. App. 4th 954, 969 (2014) (citation omitted).

77.    A good faith, interactive process requires that "[t]he employer . . . either grant the . . . employee's requested accommodation, or reject it after due consideration, and initiate discussion with the . . . employee regarding alternative

HAEGGQUIST & ECK, LLP

accommodations." 2 Cal. Code Regs. §11069(c)(1). The "goal" of the interactive process is to "'identify[] an accommodation that allows the employee to perform the job effectively,'" and the burden is on the employer. *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 261 (2000) (citation omitted).

78. At all relevant times mentioned herein, Defendant was an employer and Plaintiff was Defendant's employee.

79. At all relevant times mentioned herein, Plaintiff was in a class of persons protected by Government Code §12940 because of her mental disabilities – anxiety, depression, and PTSD. Defendant was aware of Plaintiff's mental disabilities and/or regarded or treated Plaintiff as having a mental disability that made working difficult for Plaintiff.

80. Despite her mental disabilities, Plaintiff was able to perform her essential job duties, at times with and at times without reasonable accommodations.

81. As alleged herein, Plaintiff required and requested reasonable accommodations including medical leave and a department/supervisor transfer. A department/supervisor transfer would have enabled Plaintiff to return to work; however, Defendant denied Plaintiff's requested accommodation and failed to engage in the interactive process with Plaintiff to determine whether other reasonable accommodations could be made so that she would be able to perform the essential job requirements. Plaintiff was willing to participate in an interactive process. Defendant could have provided a reasonable accommodation without undue hardship. By failing to engage in a timely, good faith, interactive process with Plaintiff, Defendants violated Government Code §12940(n).

82. As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial losses in earnings, earning capacity, and other benefits of employment, all in an amount to be determined according to proof at the time of trial. Plaintiff will also suffer tax consequences due to Defendant's failure to pay Plaintiff money owed, which will come due in a lump sum in the future.

HAEGGQUIST & ECK, LLP

Accordingly, Plaintiff is entitled to an additional amount of damages to offset the tax consequences of a lump sum award for lost earnings, plus interest.

83.    As a further proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, humiliation, embarrassment, emotional distress, and mental anguish, all in an amount to be determined according to proof at the time of trial.

84.    In performing the acts alleged, which were committed, authorized, and/or adopted and approved by Defendant's officers, directors, or managing agents, Defendant acted with oppression, fraud, malice, and with conscious disregard for the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

85.    Plaintiff is also entitled to attorneys' fees and costs pursuant to Government Code §12965(c)(6), because of Defendant's wrongful conduct.

## COUNT V

### CFRA Retaliation
### in Violation of Government Code §12945.2(k)

86.    Plaintiff realleges and incorporates herein by reference each allegation in the preceding and subsequent paragraphs.

87.    Under the CFRA, it is "an unlawful employment practice for an employer to . . . discharge . . . or discriminate against, any individual because of . . . [a]n individual's exercise of the right to . . . medical leave provided by [Government Code §12945.2] subdivision (a). Cal. Gov't Code §12945.2(k)(1). To establish CFRA retaliation, Plaintiff must prove: (1) she was eligible for CFRA; (2) she requested/took CFRA leave; (3) Defendant terminated her employment; (4) her request for/taking of CFRA leave was a substantial motivating reason for terminating her; (5) she was harmed; and (6) Defendant's retaliatory conduct was a substantial factor in causing her harm. *Judicial Council of California Civil Jury Instructions* (2024) No. 2620.

HAEGGQUIST & ECK, LLP

88.    At all times relevant hereto, Defendant was an "employer" subject to the CFRA because it directly employed five or more persons to perform services for a wage or salary during the time it employed Plaintiff. Cal. Gov't Code §12945.2(b)(4)(A). Further, Defendant was a "covered employer" subject to the CFRA because Defendant directly employed 50 or more employees within 75 miles of the worksite where it employed Plaintiff and during the time it employed Plaintiff. Gov. Code §12945.2(b) and (c)(2)(A); 2 Cal. Code Regs. §11087(d).

89.    At all times relevant hereto, Plaintiff was an "eligible employee" within the meaning of the CFRA because she was employed by Defendant for at least 1,250 hours of service during the 12-month period just prior to taking medical leave. Cal. Gov't Code §12945.2(a).

90.    As an eligible employee, Plaintiff was entitled to 12 workweeks of leave due to a "serious health condition that makes the employee unable to perform the functions of the position of that employee." Cal. Gov't Code §12945.2(b)(5)(C). The CFRA defines a "serious health condition" to include a "mental condition that involves . . . [c]ontinuing treatment or continuing supervision by a health care provider." Cal. Gov't Code §12945.2(b)(13)(B).

91.    At all times relevant hereto, Plaintiff suffered from a serious health condition as defined by the CFRA – anxiety, depression, and PTSD – that involved continuing treatment by her health care providers.

92.    Because Plaintiff's need for leave was unforeseeable, Plaintiff gave notice to Defendant as soon as possible of her intent to take medical leave. On May 8, 2023, Plaintiff provided notice and a note from her healthcare provider regarding her need for medical leave beginning on May 5, 2023.

93.    On May 25, 2023, Defendant approved Plaintiff's medical leave of absence under the CFRA from May 9, 2023, through June 25, 2023, due to her serious health condition, which return date was thereafter extended by her health care

HAEGGQUIST & ECK, LLP

provider. As such, Plaintiff took CFRA leave beginning May 9, 2023, and through her full 12-week entitlement.

94.     Thereafter, on August 21, 2023, Defendant retaliated against Plaintiff when it wrongfully terminated her employment because it refused to return Plaintiff to work with reasonable accommodation, as recommended by Plaintiff's health care provider. Plaintiff's taking of CFRA leave was a substantial motivating reason for Defendant to discharge Plaintiff.

95.     As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial losses in earnings, earning capacity, and other benefits of employment, all in an amount to be determined according to proof at the time of trial.

96.     As a further proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, humiliation, embarrassment, emotional distress, and mental anguish, all in an amount to be determined according to proof at the time of trial.

97.     In performing the acts alleged, which were committed, authorized, and/or adopted and approved by Defendant's officers, directors, or managing agents, Defendant acted with oppression, fraud, malice, and with conscious disregard for the rights of Plaintiff, and she is therefore entitled to punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

98.     Plaintiff is also entitled to attorneys' fees and costs pursuant to Government Code §12965(c)(6), because of Defendant's wrongful conduct.

## COUNT VI

### FMLA Interference
### in Violation of 29 U.S.C. §2615(a)

99.     Plaintiff realleges and incorporates herein by reference each allegation in the preceding and subsequent paragraphs.

COMPLAINT FOR DAMAGES

HAEGGQUIST & ECK, LLP

100.  The FMLA prohibits covered employers from interfering with, restraining, or denying employees' exercise of or attempt to exercise the right to take medical leave. 29 U.S.C. §2615(a)(1); 29 C.F.R. §825.220(a)(1). Further, the "prohibition against interference prohibits an employer from discriminating or retaliating against an employee . . . for having exercised . . . FMLA rights." 29 C.F.R. §825.220(c). For example, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." *Id*; *Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003) ("where an employee is subjected to 'negative consequences . . . simply because he has used FMLA leave,' the employer has interfered with the employee's FMLA rights") (citation omitted).

101.  Any violations of the FMLA or of the accompanying regulations "constitute interfering with, restraining, or denying the exercise of rights provided by the [FMLA]." 29 C.F.R. §825.220(b). To establish interference, Plaintiff must prove: (1) she was eligible for FMLA; (2) Defendant was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave (or gave notice as soon as possible if the leave was unforeseeable); and (5) Defendant denied her FMLA benefits to which she was entitled. *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011).

102.  At all times relevant hereto, Defendant was an "employer" subject to the FMLA because Defendant was engaged in commerce and employed 50 or more employees for each working day of the 20 workweeks just prior to Plaintiff taking FMLA leave. 29 U.S.C. §2611(4)(i).

103.  At all times relevant hereto, Plaintiff was an "eligible employee" covered by the FMLA because Plaintiff was employed by Defendant for at least 1,250 hours during the 12-month period just prior to taking leave and worked at a worksite where Defendants employed more than 50 employees within 75 miles. 29 U.S.C. §2611(2).

104.    As an eligible employee, Plaintiff was entitled to 12 workweeks of leave to care for a serious health condition which made her unable to perform the functions of her job. 29 U.S.C. §2612(a)(1)(D). The FMLA defines a "serious health condition" to include a "mental condition that involves . . . (B) continuing treatment by a health care provider." 29 U.S.C. §2611(11)(B).

105.    At all times relevant hereto, Plaintiff suffered from a serious health condition as defined by the FMLA – anxiety, depression, and PTSD – that involved continuing treatment by her health care providers.

106.    Because Plaintiff's need for leave was unforeseeable, Plaintiff gave notice to Defendant as soon as possible of her intent to take medical leave. On May 8, 2023, Plaintiff provided notice and a note from her healthcare provider regarding her need for medical leave beginning on May 5, 2023.

107.    On May 25, 2023, Defendant approved Plaintiff's medical leave of absence under the FMLA from May 9, 2023, through June 25, 2023, due to her serious health condition, which return date was thereafter extended by her health care provider. As such, Plaintiff took FMLA leave beginning May 9, 2023, and through her full 12-week entitlement.

108.    Thereafter, on August 21, 2023, Defendant retaliated against Plaintiff when it wrongfully terminated her employment because it refused to return Plaintiff to work with reasonable accommodation, as recommended by Plaintiff's health care provider. Plaintiff's taking of FMLA leave was a substantial motivating reason for Defendant to discharge Plaintiff.

109.    As a proximate result of Defendants' wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial losses in wages, salary, employment benefits, and other compensation, and has suffered other actual monetary loses, all in an amount to be determined according to proof at the time of trial, plus interest thereon. 29 U.S.C. §2617(a)(1)(A)(i), (ii).

HAEGGQUIST & ECK, LLP

2a17150955832c26

110.    Plaintiff is also entitled to liquidated damages equal to her lost wages, salary, employment benefits, and other compensation, and other actual monetary loses, plus interest thereon as a result of Defendants' violation of the FMLA. 29 U.S.C. §2617(a)(1)(A)(iii).

111.    Plaintiff is also entitled to recover her attorneys' fees, expert witness fees, and other costs of the action. 29 U.S.C. §2617(a)(3).

## COUNT VII

### Retaliation for Requesting Reasonable Accommodation
### in Violation of Government Code §12940(m)(2)

112.    Plaintiff realleges and incorporates here by reference each and every allegation in the preceding and subsequent paragraphs.

113.    Under the FEHA, "[i]t is an unlawful employment practice . . . [f]or an employer . . . [to] retaliate or otherwise discriminate against a person for requesting accommodation under [Government Code §12940(m)(1)], regardless of whether the request was granted." Gov't Code §12940(m)(2).

114.    Employers must "make reasonable accommodation for the known … mental disability of an . . . employee." Gov't Code §12940(m)(1). "Mental disability" means "any mental or psychological disorder or condition, such as . . . emotional or mental illness . . . that limits a major life activity." Gov't Code §12926(j)(1). "Mental disability" also includes "[b]eing regarded or treated by the employer . . . as having, or having had, any mental condition that makes achievement of a major life activity difficult." Gov't Code §12926(j)(4). "'Major life activities' shall be broadly construed and shall include physical, mental, and social activities and working." Gov't Code §12926(j)(1)(C). As such, "mental disability" includes "chronic or episodic conditions such as clinical depression, bipolar disorder, [and] post-traumatic stress disorder . . . ." 2 Cal. Code Regs. §11065(d)(1).

115.    The law provides a "non-exhaustive" list of accommodations, including job restructuring, transfer, reassignment to a vacant position, and extended leaves of

COMPLAINT FOR DAMAGES

HAEGGQUIST & ECK, LLP

absence, among many others. *Id.* at 948; Gov't Code §12926(p); 2 Cal. Code Regs. §§11065(p)(2), 11068(c). Transferring an employee to work under a new supervisor can be a reasonable accommodation. *See, e.g., Do*, 2020 Cal. App. Unpub. LEXIS 7117, at *7-10.

116.   At all relevant times mentioned herein, Defendant was an employer and Plaintiff was Defendant's employee.

117.   At all relevant times mentioned herein, Plaintiff was in a class of persons protected by Government Code §12940 because of her mental disabilities – anxiety, depression, and PTSD. Defendant was aware of Plaintiff's mental disabilities and/or regarded or treated Plaintiff as having a mental disability that made working difficult for Plaintiff.

118.   Despite her mental disabilities, Plaintiff was able to perform her essential job duties, at times with and at times without reasonable accommodations.

119.   As alleged herein, Plaintiff required and requested reasonable accommodations including medical leave and a department/supervisor transfer. A department/supervisor transfer would have enabled Plaintiff to return to work; however, Defendant discriminatorily refused to approve Plaintiff's accommodation request and refused to provide Plaintiff with any other reasonable accommodation for her mental disabilities, which it could have done without undue hardship. Instead of accommodating Plaintiff, Defendant retaliated against her. Among other adverse employment actions, Defendant wrongfully terminated Plaintiff because of her mental disabilities and because she requested an accommodation for her mental disabilities. As such, Defendant violated Government Code §12940(m)(2).

120.   As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial losses in earnings, earning capacity, and other benefits of employment, all in an amount to be determined according to proof at the time of trial. Plaintiff will also suffer tax consequences due to Defendant's failure to pay Plaintiff money owed, which will come due in a lump sum in the future.

HAEGGQUIST & ECK, LLP

Accordingly, Plaintiff is entitled to an additional amount of damages to offset the tax consequences of a lump sum award for lost earnings, plus interest.

121.   As a further proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, humiliation, embarrassment, emotional distress, and mental anguish, all in an amount to be determined according to proof at the time of trial.

122.   In performing the acts alleged, which were committed, authorized, and/or adopted and approved by Defendant's officers, directors, or managing agents, Defendant acted with oppression, fraud, malice, and with conscious disregard for the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

123.   Plaintiff is also entitled to attorneys' fees and costs pursuant to Government Code §12965(c)(6), because of Defendant's wrongful conduct.

## COUNT VIII

### Failure to Prevent Discrimination and Retaliation
### in Violation of Government Code §12940(k)

124.   Plaintiff realleges and incorporates here by reference each and every allegation in the preceding and subsequent paragraphs.

125.   Government Code §12940(k) makes it unlawful "[f]or an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Gov't Code §12940(k). "[R]etaliation is a form of discrimination actionable under [Government Code] section 12940, subdivision (k)." *Taylor v. City of L.A. Dep't of Water & Power*, 144 Cal. App. 4th 1216, 1239 (2006) (disapproved on other grounds in *Jones v. Lodge at Torrey Pines P'ship*, 42 Cal. 4th 1158, 1173-74 (2008)).

126.   At all relevant times mentioned herein, Defendant was an employer and Plaintiff was Defendant's employee.

HAEGGQUIST & ECK, LLP

127.   At all relevant times mentioned herein, Plaintiff was in a class of persons protected by Government Code §12940 because of her age, mental disabilities, and her request for a reasonable accommodation for her mental disabilities. Defendant was aware of Plaintiff's age, mental disabilities, and request for a reasonable accommodation, which Defendant wrongfully denied.

128.   As described above, Defendant discriminated against Plaintiff because of her age and mental disabilities and retaliated against Plaintiff for requesting a reasonable accommodation for her mental disabilities. After denying Plaintiff's request for a reasonable accommodation, Defendant then wrongfully terminated Plaintiff's employment.

129.   At all times mentioned herein, Defendant was aware of the discriminatory and retaliatory conduct toward Plaintiff and failed to take reasonable steps to prevent such conduct from occurring. Thus, Defendant violated Government Code §12940(k).

130.   As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial losses in earnings, earning capacity, and other benefits of employment, all in an amount to be determined according to proof at the time of trial. Plaintiff will also suffer tax consequences due to Defendant's failure to pay Plaintiff money owed, which will come due in a lump sum in the future. Accordingly, Plaintiff is entitled to an additional amount of damages to offset the tax consequences of a lump sum award for lost earnings, plus interest.

131.   As a further proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, humiliation, embarrassment, emotional distress, and mental anguish, all in an amount to be determined according to proof at the time of trial.

132.   In performing the acts alleged, which were committed, authorized, and/or adopted and approved by Defendant's officers, directors, or managing agents, Defendant acted with oppression, fraud, malice, and with conscious disregard for the

rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

133. Plaintiff is also entitled to attorneys' fees and costs pursuant to Government Code §12965(c)(6), because of Defendant's wrongful conduct.

## PRAYER

WHEREFORE, Plaintiff seeks judgment as follows:

A.    For compensatory damages, including loss of wages and benefits (past and future), and emotional distress damages (past and future) according to proof at trial;

B.    For attorneys' fees and costs of suit pursuant to Government Code §12965(c)(6), 29 U.S.C. §2617(a)(3), and any other applicable provision for attorneys' fees and costs;

C.    For liquidated damages pursuant to 29 U.S.C. §2617(a)(1)(A)(iii);

D.    For pre-judgment and post-judgment interest to the extent allowable by law;

E.    For punitive and exemplary damages, according to proof;

F.    For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims.

Dated: May 8, 2024                        HAEGGQUIST & ECK, LLP
                                          ALREEN HAEGGQUIST (221858)
                                          JENNA M. RANGEL (272735)
                                          ANNA SCHWARTZ (346268)


                                          By:    _____
                                                 JENNA M. RANGEL


                                          225 Broadway, Suite 2050

34

COMPLAINT FOR DAMAGES



San Diego, CA  92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878

Attorneys for Plaintiff Kara Sandler